UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——

TRAVIS TILLMAN,

                    Plaintiff,                              Case No. 1:13-cv-297

v.                                                          Honorable Janet T. Neff

ERICA HUSS et al.,

                    Defendants.

_____/

## OPINION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Apol, Barber, Dozeman, Edwards, Fair, Gawne, Gehoski, Gilkey, Hengesbach, Heyns, Huss, King, Norwood, Prelesnik, Richardson, Smith, Stoddard, Todd, and Unknown Part(y)(ies) ##4-9. The Court will allow service of the complaint on the remaining Defendants.

Also before the Court are several motions filed by Plaintiff: a motion to appoint counsel (docket #7) and a motion for a restraining order (docket #8). In addition, inmate Michael Gresham moves to intervene as a plaintiff in this action (docket #10) and moves for class certification, a preliminary injunction, a temporary restraining order, and appointment of counsel (docket #12). The foregoing motions will be denied.

## Discussion

### I.    Factual allegations

Plaintiff Travis Tillman[1] is a state prisoner incarcerated by the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison (MBP), where he is serving a non-paroleable life sentence for felony murder,[2] though the events giving rise to this action occurred while he was housed at the Ionia Correctional Facility (ICF). He sues MDOC Director Daniel Heyns and the following employees at ICF: Warden John Prelesnik; Acting Warden Cathy Stoddard; Deputy Wardens Erica Huss and Nanette Norwood; Librarian Joseph Novak; Sergeants Christopher King and "Unknown" Goodstrey; Lieutenant "Unknown" Edwards; Resident Unit Officers (RUOs) J. Fair, "Unknown" Jameson, "Unknown" Rutgers, and "Unknown" Richardson; Corrections Officers "Unknown" Corbit, "Unknown" Martin, "Unknown" Teft, and "Unknown" Hengesbach; MSW "Unknown" Apol; Registered Nurses (RNs) Betty Kemp, Rebecca Delano, and Angela Todd; Unit Chief Charles Gawne; Resident Unit Managers (RUMs) Bo Gilkey and "Unknown" Payne; Assistant Resident Unit Supervisors (ARUSes) V. Gehoski and Mellisa Barber;

---

[1]In his pleadings, Plaintiff calls himself "Travis Tillman-Bey." (*See* Compl., docket #1, Page ID#1.) The Court will use the name given in Plaintiff's profile on the MDOC's Offender Tracking Information System (OTIS). *See* http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=324495 (visited July 31, 2013).

[2]Information regarding Plaintiff's sentence has been obtained from his OTIS profile.

Psychologist Kirt Dozeman; Hearing Investigator P. Smith; Acting Lieutenant/Hearing Officer "Unknown" Gleason; "Unknown Shift Commanders from (2/8/12 until 2/10/12)," whom the Court will refer to as Unknown Part(y)(ies) #1; two parties identified as "Unknown ERTs" (hereinafter, Unknown Party #2 and Unknown Party #3, respectively); and "Unknown Internal Affairs Person[nel] (ICF)" (hereinafter, Unknown Part(y)(ies) #4). (Compl., docket #1, Page ID##17-19.) He also sues the following individuals at the Duane L. Waters Hospital (DWH):[3] "Unknown Female Psychiatrist" (Unknown Party #5); "Unknown Female Psychologist" (Unknown Party #6); "Unknown Internal Affairs Person[nel] (DWH)" (Unknown Part(y)(ies) #8). (*Id.*, Page ID#18.) Finally, he sues an unidentified state police officer in Lansing, Michigan (Unknown Party #7), and "Unknown Person[nel]" at the United States Department of Justice (Unknown Part(y)(ies) #9). (*Id.*)

According to the complaint, on the morning of February 2, 2012, Plaintiff was interviewed by the security classification committee at ICF. At the interview, he informed Deputy Warden Huss and ARUS Barber that he had written several prisoner grievances against staff in unit 1 at ICF, but he had not been interviewed by any supervisors, he had not received timely responses to his grievances, and his appeals from the grievances responses were not being processed. Huss asked Barber why Plaintiff was not being interviewed. Barber stated that she was not aware of the issue and that she would make sure that she responded to any grievances that she received. Plaintiff informed Huss that Barber was, in fact, the subject of one of those grievances, because she had given one of Plaintiff's other grievances to Sgt. King.[4] Plaintiff asked Huss to prevent

---

[3]DWH is a MDOC healthcare facility. *See* http://www.michigan.gov/corrections/0,4551,7-119--5338--,00.html (visited July 2, 2013).

[4]Apparently, the grievance was about conduct by King. King allegedly attempted to "intimidate" Plaintiff into "signing off" on the grievance by "threatening" Plaintiff. (Compl., Page ID#4.)

Defendants King, Fair, Rutgers, Martin and Teft to stop their "repeated harassment" and attempts to retaliate against Plaintiff for filing grievances. (Compl., Page ID#4.) Huss promised to look into it. Plaintiff also informed RUM Payne about threats of physical harm by his staff, and the fact that he and ARUS Barber had failed to "review" Plaintiff regarding his grievances; however, Defendant Payne allegedly failed to protect Plaintiff from further harm. (*Id.*, Page ID#11.)

At around 2:30 p.m. that afternoon, prison staff started running showers for inmates in A-wing of unit 1, until ARUS Barber ordered Sgt. King to call all unit 1 staff to B-wing. When staff returned from B-wing to restart the showers, Plaintiff saw Defendants Fair, Martin, and Teft staring at his cell. Martin then came to Plaintiff's cell, escorted him to the shower area, and put him in a cold shower. Plaintiff complained to Martin that the water was cold, but Martin told Plaintiff that "he was not a plumber, so deal with it." (*Id.*) When Plaintiff was finished, Teft took Plaintiff to escort him back to his cell. When Plaintiff was within two feet of his cell, Defendant Rutgers started closing the cell door from the control panel. Plaintiff stopped walking toward his cell to avoid being "smashed" in the door. (*Id.*) Teft then shoved Plaintiff from behind, causing Plaintiff to hit his head on the side of the door. After the door closed, Teft told Plaintiff, "You['re] keeping those restraints [b]itch," referring to Plaintiff's shower restraints on his wrists and ankles. (*Id.*) Teft and Rutgers left Plaintiff in his restraints until the following morning, when he was released by Defendant Edwards. Plaintiff asserts that Edwards became aware of the conduct by Defendants Rutgers and Teft when he released Plaintiff from his restraints, but he failed to prevent further "abuse" and "harass[ment]" by "his" staff. (*Id.*, Page ID#11.)

Plaintiff developed a lump on his head as a result of running into the door, but Edwards did not attempt to obtain medical treatment for Plaintiff. Plaintiff submitted a request for medical attention and Nurse Todd informed him that he had been placed on a list for an examination. Plaintiff never received an examination, however.

Plaintiff sent complaints to ICF internal affairs, Warden Prelesnik, and the United States Department of Justice, requesting an investigation into the alleged assault by Officer Teft, but Plaintiff received no response. Plaintiff also complained to "Psych" Apol, but Apol told him that there was nothing he could do to help, because Plaintiff was complaining about "custody issues." (*Id.*)

On February 8, 2012, Defendant Rutgers entered Plaintiff's unit and told other prisoners that Plaintiff was a "rat (snitch)," that Plaintiff's family was "calling up to the prison making complaints," and that Plaintiff was writing "snitch kites (grievances) about staff." (*Id.*, Page ID#6.) Rutgers stated that Plaintiff had "seen nothing yet just wait and see." (*Id.*) In response to Rutgers's comments, Plaintiff filled a bottle with urine and threw it in Rutgers's face. Sometime thereafter, Defendant Goodstrey came to Plaintiff's cell and stated, "[W]hy you kicking on the door (bitch)[, you're] going in restraints." (*Id.*) Goodstrey put Plaintiff in restraints in a "hogtied" position. (*Id.*) Goodstrey and Teft then mocked Plaintiff by telling him to come to the door to be released from his restraints, even though the restraints prevented Plaintiff from doing so. Later, they charged Plaintiff with a misconduct, claiming that he refused to come out of his restraints. (*Id.*)

Defendants Goodstrey and Teft left Plaintiff in his cell, in restraints, until February 10, 2012, thereby depriving him of water, showers, food, and the use of a toilet during that time. Plaintiff pleaded with the shift commanders who were on duty, Unknown Part(y)(ies) #1, to give

him water to drink and to let him out of restraints so that he could relieve himself, but they refused.

At around 9:00 a.m on February 10, Nurse Kemp came to Plaintiff's door and called out his name. When he did not respond, she brought RUO Jameson, Officer Corbit, and other officers to Plaintiff's cell. Jameson told Kemp that Plaintiff was "breathing," and then they left. (*Id.*) Sometime after lunch that day, Kemp returned to Plaintiff's cell and attempted to get his attention. He did not respond, so she left.

Kemp returned at 12:30 p.m. with an "ERT Team," which "rushed" into Plaintiff's cell and "jumped on Plaintiff's back with a shield." (*Id.*, Page ID#7.) Kemp checked Plaintiff's blood pressure and temperature and then she and the ERT Team left, leaving Plaintiff in his restraints.

Sometime after 2:30 p.m., Sgt. Goodstrey and the ERT Team again rushed into Plaintiff's cell and jumped on his back with a shield. (*Id.*) Goodstrey released the chain attaching Plaintiff's ankles to his wrist and told Plaintiff to stand up. Plaintiff could not comply, so he was "snatched" off his bed by a leash attached to his wrist and then dragged across the floor to his cell door. (*Id.*) Goodstrey and the ERT Team stepped out of Plaintiff's cell, closed the door, and ordered Plaintiff to stand on his feet so that they could remove his restraints. Plaintiff could not comply. He was then "repeatedly snatched" through the food slot by the leash attached to his wrist. (*Id.*) Goodstrey and the ERT Team again entered Plaintiff's cell, this time accompanied by RUO Martin, Officer Teft, and other officers. They attempted to have Plaintiff stand and walk using pressure points, and then slammed him into the floor and the wall while dragging him down the hallway.

The ERT Team took Plaintiff to a dayroom in B-wing where they placed him in a cage. Sgt. Goodstrey and Nurse Delano returned and asked Plaintiff if they could take his blood pressure. He could not respond because he was dehydrated. Delano told Goodstrey that Plaintiff was "faking." (*Id.*, Page ID#7.) Delano, Goodstrey, and the ERT Team left, and then Goodstrey returned with the ERT Team, carrying a can of gas. Goodstrey ordered Plaintiff to stand up and "release [him]self to restraints." (*Id.*) Plaintiff immediately started pushing himself up off the floor. Before he could stand up, Goodstrey sprayed him in the face with gas. According to Plaintiff, Goodstrey's actions were done with "malicious and sadistic intent to retaliate" against him. (*Id.*, Page ID#8.)

Five to ten minutes after he was sprayed, Plaintiff was transferred to DWH. Apparently, Nurse Kemp had determined that Plaintiff should be sent to the hospital because he was disoriented, his blood pressure was high, he had a fever, and he was not responding. Defendant Norwood approved Plaintiff's transfer.

Plaintiff remained at DWH until February 16, 2012. On February 11, he asked to speak with someone to make a complaint about the events leading up to his hospitalization. A sergeant (Unknown Party #7) came to speak with him and noticed lacerations on Plaintiff's wrists and elbows. He took pictures of the lacerations and told Plaintiff to write a complaint to the internal affairs section at DWH. Plaintiff wrote a complaint but did not turn it in that day. On February 13, Plaintiff spoke with a psychiatrist and psychologist at DWH (Unknown Party #5 and Unknown Party #6, respectively). He told them what had happened to him at ICF and gave them his complaint. The psychologist promised that she would turn it over the internal affairs division at DWH. Plaintiff never received a response to his complaint.

When Plaintiff returned to ICF, RUO Fair told him that his "punishment hadn't even started yet[,] just wait and see." (*Id.*, Page ID#8.) That night, Plaintiff started a hunger strike to protest the actions of prison staff. The next day, February 17, 2012, Plaintiff told Defendant Apol that his life was in danger because of threats that he had received and because of the assault by Defendants Fair, Rutgers, and other officers in unit 1. Apol placed Plaintiff on observation, and Defendants King and Fair moved him to another cell. After he was moved, Rutgers told Plaintiff that he would destroy Plaintiff's property.

On March 2, 2012, Unit Chief Gawne told Plaintiff that he had been informed about complaints that Plaintiff had raised at DWH. Plaintiff asserts that Gawne failed to protect Plaintiff from further "mental and physical abuse." (*Id.*, Page ID#11.) That same day, however, Plaintiff was moved to another unit, in order "to prevent [him from] being constantly harassed and threatened by unit #1 staff." (*Id.*, Page ID#9.) On March 5, 2012, Plaintiff was released from observation, but he did not receive all of his property. He complained about this to Defendants Huss, Gilkey, Gehoski, Apol, and Corbit, and to other officers who are not defendants to this action (ARUS Ault, Sgt. LaBelle, Officer Becker, RUO Baldwin, and RUO Bronson). They informed Plaintiff that unit 1 staff could not locate his property.

On March 5, 2012, Officer Hengesbach passed out the food trays in Plaintiff's unit. When he stopped at Plaintiff's cell door, he attempted to give Plaintiff "food loaf." (*Id.*, Page ID#12.) Plaintiff stated that he "got off food loaf" on March 4. (*Id.*) Hengesbach left. When Hengesbach returned on his next round, Plaintiff asked if Hengesbach was going to feed him. Hengesbach stated, "Not [t]oday," because "he was informed that [Plaintiff] like[s] to throw shit at officers." (*Id.*)

On July 2, 2012, Nurse Delano allegedly dropped Plaintiff's medication on the floor, telling him to "write that up bitch." (*Id.*, Page ID#11.)

Plaintiff further alleges that he repeatedly requested legal materials from the ICF law librarian, Defendant Novak, but because he did not receive them, he wrote a grievance about it. On July 7, 2012, Novak issued Plaintiff a misconduct ticket for possession of stolen property/theft of a law book from the law library, occurring on February 2, 2012. Plaintiff asserts that the book went missing along with the rest of his property when he was placed on observation. Officer Bolten (who is not a defendant in this action) called Novak to inform him that Plaintiff was not responsible for the loss of the book. Nevertheless, Novak issued the misconduct ticket, and Plaintiff was found guilty of the charge at a misconduct hearing. Plaintiff was punished with 15 days of loss of privileges and a fine of $35.00. Plaintiff appealed the conviction to the deputy warden, and Officer Bolten prepared a statement for that appeal, explaining that Plaintiff had "no involvement" in the loss of the book. (*Id.*, Page ID#13.) The misconduct conviction was upheld on appeal.

Plaintiff asserts that Novak wrote the misconduct ticket in retaliation for Plaintiff's grievance, that Hearing Investigator Smith was "negligent" in his duties by allowing the misconduct charge to proceed to a hearing, and that Hearing Officer Gleason acted in an "unprofessional" and "retaliatory" manner by finding Plaintiff guilty of a misconduct for which there was no evidence of guilt and for creating a "fictitious reason" for Plaintiff's guilt. (*Id.*)

Plaintiff asserts that he was not convicted of any other misconducts while he was in unit 2, until October 26, 2012, a day on which Defendants Fair and Rutgers worked in his unit. At around 8:00 that morning, Defendants Richardson and Fair came to Plaintiff's cell to escort him to the shower area. Before they arrived at the showers, Rutgers stepped in front of Plaintiff and stated,

"[W]hat[']s up my little shit throwing bitch?" (*Id.*, Page ID#9.) Plaintiff did not respond. Rutgers followed Plaintiff into the shower area and told him, "You know you['re] going to die in here?" (*Id.*)

While Plaintiff was in the showers, Defendant Fair searched Plaintiff's cell and claimed that he found a knife in Plaintiff's mattress. Richardson also entered Plaintiff's cell and took Plaintiff's property. Plaintiff asserts that Defendants Fair and Richardson repeatedly harassed, threatened and retaliated against him. (*Id.*)

Plaintiff allegedly filed a number of complaints against Rutgers and Fair for their "verbal and physical assaults," to no avail. (*Id.*, Page ID#9.) Defendant Heyns learned about many of the events described in Plaintiff's pleadings through Plaintiff's grievances, but Heyns did not investigate them. Similarly, Defendants Prelesnik and Stoddard were informed of "verbal and physical abuse" inflicted on Plaintiff through Plaintiff's kites and prison grievances, but they did not act to protect Plaintiff. (*Id.*, Page ID#10.) Plaintiff repeatedly informed Psychologist Dozeman of the "brutality" of ICF staff and unspecified threats against Plaintiff, but Dozeman allegedly refused to help or inform his superiors about Plaintiff's complaints. (*Id.*, Page ID#12.) Plaintiff also sent a complaint to the state police informing them of the alleged assault by Defendant Teft, but they failed to take action to protect Plaintiff. Instead, they sent the information to the internal affairs division at ICF, which also failed to take any action. Plaintiff also sent complaints to various government officials outside the MDOC, including officials at the Department of Justice, requesting that criminal charges be brought against staff members who had assaulted Plaintiff. No charges were brought.

As relief in this action, Plaintiff seeks compensatory and punitive damages from each Defendant and an order requiring the MDOC to place a "SPON" in his file "for all parties involved." (Compl., docket #1, Page ID#15.)

II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## A. Supervisory Defendants

Plaintiff's claim against MDOC Director Heyns is based solely on his contention that he failed to properly supervise or control his subordinates, and failed to take action in response to Plaintiff's complaints and grievances about other MDOC officials. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Furthermore, liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). As the Sixth Circuit has repeatedly emphasized:

> There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983

> plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.

*Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)). In short, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has not alleged that Heyns engaged in any active unconstitutional behavior.

Similarly, Plaintiff's only allegations against Warden Prelesnik, Acting Warden Stoddard, Deputy Warden Huss, RUM Gilkey, ARUS Gehoski, the psychiatrist and the psychologist at DWH (Unknown Party #5 and Unknown Party #6, respectively), the unknown state police officer in Lansing (Unknown Party #7), and the officials at the Department of Justice and the internal affairs divisions of ICF and DWH (Unknown Part(y)(ies) ##4, 8, 9) are that they failed to investigate the conduct of other government officials and/or failed to meaningfully respond to Plaintiff's complaints about such conduct. Plaintiff does not allege that any of the foregoing Defendants participated in or actively engaged in any unconstitutional conduct.

To the extent Plaintiff contends that the foregoing Defendants failed to protect him, the Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates" in their care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). In order to establish liability under the Eighth Amendment, Plaintiff must demonstrate that Defendants were deliberately indifferent to "a substantial risk of serious harm." *Farmer*, 511 U.S. at 828; *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004). "To demonstrate deliberate indifference, an inmate must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by

failing to take reasonable measures to abate it.'" *Bowles*, 361 F.3d at 294. None of Plaintiff's allegations indicate that any of the foregoing Defendants were deliberately indifferent to a serious risk of harm to Plaintiff. Plaintiff merely alleges that he complained about unspecified threats and past conduct by other prison officials. Thus, Plaintiff fails to state a claim against Defendants Gehoski, Gilkey, Heyns, Huss, Prelesnik, Stoddard, and Unknown Part(y)(ies) ##4-9.[5]

## B. Other Defendants

### 1. Deputy Warden Norwood

Plaintiff alleges that Norwood approved an order to transfer Plaintiff to DWH. Such conduct does not state a constitutional claim, and for the reasons stated *supra* with respect to Defendant Heyns, Norwood cannot be held liable for the conduct of her subordinates under a theory of vicarious liability or respondeat superior, or for failing to respond to Plaintiff's grievances. Plaintiff does not allege that Norwood was aware of, or deliberately indifferent to, a substantial risk of serious physical harm to Plaintiff. Thus, Plaintiff also fails to state a claim against Defendant Norwood.

### 2. ARUS Barber

Plaintiff claims that Defendant Barber failed to interview Plaintiff regarding his grievances. Plaintiff does not have a constitutional right to an effective prison grievance procedure. *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also*

---

[5]In addition, to the extent that Plaintiff sues a Defendant for its failure to pursue criminal charges against another Defendant, Plaintiff fails to state a claim because, like any other private citizen, he "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Diamond v. Charles*, 476 U.S. 54, 63 (1986).

*Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Thus, the failure to interview Plaintiff or conduct an investigation into his grievances did not violate Plaintiff's constitutional rights. *See Shehee*, 199 F.3d at 300 (failure to act in response to a prisoner's grievances does not give rise to a § 1983 claim). Plaintiff does not allege that Barber was aware of, or deliberately indifferent to, a substantial risk of serious physical harm to Plaintiff.

Plaintiff also alleges that Barber gave one of his grievances to another prison official, Sgt. King, and later ordered a meeting of prison staff in unit 1. The foregoing allegations do not implicate any of Plaintiff's constitutional rights. Thus, Plaintiff fails to state a claim against Barber.

### 3. Hearing Investigator Smith

Plaintiff claims that Defendant Smith was negligent in his duties by allowing the theft misconduct charge to proceed to a hearing. Plaintiff is not constitutionally-entitled to a proper investigation by a hearing investigator before a misconduct hearing, or to have an investigator ensure that improper charges are dismissed. Even if MDOC policies or state law imposed a duty on Smith to conduct an investigation or perform other related tasks, Smith's failure to comply with prison policies and state law is not a constitutional violation. *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest). Section 1983 is addressed to remedying violations of federal law, not state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney*, 501 F.3d at 580-81. Thus, Plaintiff does not state a claim against Defendant Smith.

4. <u>Officer Hengesbach</u>

Defendant Hengesbach allegedly deprived Plaintiff of his preferred meal on one occasion, offering Plaintiff food loaf and then refusing to provide any food after Plaintiff objected to the food loaf. The Eighth Amendment protects prisoners by requiring that "prison officials . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee [their] safety . . . .'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). However, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987). In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "deliberate indifference" to that risk. *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer*, 511 U.S. at 834).

Plaintiff does not allege that the deprivation of one meal on one occasion threatened his health or safety. Isolated deprivations of meals to prisoners generally do not rise to the level of an Eighth Amendment violation. *See Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982) (holding that one meal per day, over fifteen days, that provided sufficient nutrition to sustain normal health did not violate the Eighth Amendment); *Islam v. Jackson*, 782 F. Supp. 1111, 1114 (E.D. Va. 1992) ("Missing one meal as an isolated event does not deprive an inmate of basic nutritional needs."); *Waring v. Meachum*, 175 F. Supp. 2d 230, 240-41 (D. Conn. 2001) (finding no Eighth Amendment claim where inmate missed two meals and there was no indication that future meals were missed); *Cagle v. Perry*, No. 9:04–CV–1151, 2007 WL 3124806, at *14 (N.D.N.Y. Oct. 24, 2007) (finding that deprivation of two meals is "not sufficiently numerous, prolonged or severe to

-16-

rise to the level of an Eighth Amendment violation"). Thus, Plaintiff fails to an Eighth Amendment claim against Hengesbach.

Plaintiff claims that Hengesbach's actions constituted "retaliation," ostensibly referring to Hengesbach's statement that he would not feed Plaintiff because Plaintiff "like[s] to throw shit at officers." (*See* Compl., Page ID#12.) Plaintiff has not stated a viable retaliation claim, however, because he has not alleged any protected conduct motivating Hengesbach's actions. Clearly, assaulting prison staff is not protected conduct. *Cf. Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (insolent behavior, which violates prison rules, is not protected conduct); *see also People v. Boyd*, 300 N.W.2d 760, 762 (Mich. Ct. App. 1980) (holding that throwing urine at a prison employee constitutes an assault under Mich. Comp. Laws § 750.197c). Consequently, Hengesbach will be dismissed for failure to state a claim.

### 5. Sgt. King

Plaintiff asserts that Defendant King "attempted to intimidate me into signing off [on a grievance] by threatening me." (Compl., Page ID#4.) To the extent Plaintiff contends that King intended to deter Plaintiff from engaging in protected conduct (i.e., pursuing a prison grievance), his allegations are too vague to state a retaliation claim. To state such a claim, Plaintiff must allege sufficient facts from which to infer that an adverse action was taken against him. *See Thaddeus-X*, 175 F.3d at 394. The adverseness inquiry is an objective one: the relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness;" the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002). A specific threat may satisfy the adverse-action requirement if it would deter a person of ordinary firmness from exercising his or her First Amendment rights, *see, e.g., Thaddeus-X*, 175 F.3d at 396, 398 (threat of

physical harm); *Smith v. Yarrow*, 78 F. App'x 529, 542 (6th Cir. 2003) (threat to change drug test results). However, certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations. *Thaddeus-X*, 175 F.3d at 398; *Smith*, 78 F. App'x at 542. Plaintiff alleges no details about King's actions or statements from which to infer that they were sufficiently adverse to give rise to a retaliation claim. Thus, Plaintiff's allegations are not sufficient to state a plausible claim. *See Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief.").

King also helped move Plaintiff from one cell to another, for the purpose of placing Plaintiff on observation, but that conduct does not implicate any of Plaintiff's constitutional rights. Accordingly, King will be dismissed for failure to state a claim.

### 6. RUO Fair

Plaintiff refers to "repeated harassment" and retaliation by Fair prior to the date of the events alleged in the complaint (Compl., Page ID#4), but Plaintiff does not describe that conduct with any specificity. Plaintiff also refers to "assaults (verbal and physical)" by Fair (*id.*, Page ID#9), but the complaint does not describe any conduct by Fair that could be characterized as an assault. Thus, the foregoing allegations are too vague to state a claim. *See Iqbal*, 556 U.S. at 679.

After Plaintiff returned from DWH, Fair allegedly stated that Plaintiff's "punishment hadn't even started yet just . . . wait and see." (Compl., Page ID#8.) Verbal abuse and harassment like the foregoing do not give rise to a constitutional claim. Although unprofessional and deplorable, such statements do not constitute punishment within the meaning of, or rise to the level of unnecessary and wanton infliction of pain proscribed by, the Eighth Amendment. *Ivey*, 832 F.2d

at 955; *see also Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits); *Violett v. Reynolds,* No. 02-6366, 2003 WL 22097827, at *3 (6th Cir. Sept. 5, 2003) (verbal abuse and harassment do not constitute punishment that would support an Eighth Amendment claim); *Thaddeus-X v. Langley*, No. 96-1282, 1997 WL 205604, at *1 (6th Cir. Apr. 24, 1997) (verbal harassment is insufficient to state a claim); *Murray v. U.S. Bureau of Prisons*, No. 95-5204, 1997 WL 34677, at *3 (6th Cir. Jan. 28, 1997) ("Although we do not condone the alleged statements, the Eighth Amendment does not afford us the power to correct every action, statement or attitude of a prison official with which we might disagree."); *Clark v. Turner*, No. 96-3265, 1996 WL 721798, at *2 (6th Cir. Dec. 13, 1996) ("Verbal harassment or idle threats are generally not sufficient to constitute an invasion of an inmate's constitutional rights.").

Plaintiff also claims that Fair falsely charged him with a class I misconduct for possession of a weapon. Plaintiff received a hearing on those charges on November 14, 2012, though he does not indicate the result. (*See* Compl., Page ID#10.) Plaintiff does not have a constitutional right to avoid false accusations of misconduct. Like verbal harassment, the filing of a false misconduct report also does not violate the Eighth Amendment. *Williams v. Reynolds*, 198 F.3d 248 (6th Cir. 1999) (unpublished table decision) ("[N]either verbal harassment or threats nor the filing of a false misconduct report constitute punishment within the context of the Eighth Amendment.") (citing *Ivey*, 832 F.2d at 955, and *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)); *see also Bruggeman v. Paxton*, 15 F. App'x 202, 205 (6th Cir. 2001) (holding that punishment on the basis of a false misconduct report does not state an Eighth Amendment claim).

In addition, Plaintiff does not state a due process claim under the Fourteenth Amendment. Plaintiff acknowledges that he received a hearing on the charges; he does not allege that the hearing was defective any in manner. "False accusations of misconduct filed against an inmate do not constitute a deprivation of constitutional rights where the charges are adjudicated in a fair hearing." *Jackson v. Madery*, 158 F. App'x 656, 662 (6th Cir. 2005); *see also Cromer v. Dominguez*, 103 F. App'x 570, 573 (6th Cir. 2004); *Jackson v. Hamlin*, 61 F. App'x 131, 132 (6th Cir. 2003).

Plaintiff also contends that the false misconduct charges were retaliatory; however, Plaintiff merely alleges the ultimate fact of retaliation by Fair in this action. He has not presented any facts to support his conclusion that Defendant Fair retaliated against him for engaging in protected conduct.

Finally, if Plaintiff was convicted of the charges, his claim against Fair would be thwarted by the factual findings in the misconduct proceedings. The Sixth Circuit has held that findings in major misconduct proceedings are entitled to preclusive effect. *Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013). Thus, if the hearing officer in Plaintiff's misconduct proceedings determined that Plaintiff did indeed possess a weapon as Fair claimed, then Plaintiff would be barred from asserting that Fair's accusations were false. For all of the foregoing reasons, therefore, Defendant Fair will be dismissed for failure to state a claim.

### 7. Nurse Todd

Defendant Todd allegedly failed to schedule an examination of Plaintiff's head after he collided with his cell door. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with

contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer*, 511 U.S. at 834. To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must demonstrate "the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Plaintiff has not alleged a serious need for medical care or deliberate indifference to such a risk. A bump on the head does not present a serious need for care. Plaintiff does not allege

that he suffered any injury or detriment as a result of Defendant's failure to examine him. Consequently, Plaintiff does not state a claim against Defendant Todd.

### 8. Unit Chief Gawne

Plaintiff asserts that Defendant Gawne learned about Plaintiff's allegations to the psychologists at DWH regarding harassing conduct by prison officials at ICF, and claims that Gawne failed to protect Plaintiff from further abuse after Plaintiff returned from DWH. Plaintiff's claim against Gawne is at odds with his allegations. The day after Plaintiff returned from DWH, he told Defendant Apol that his life was in danger because of a prior assault and threats by unit 1 staff. As a result, Plaintiff was moved to an observation cell. Approximately two weeks later, Plaintiff was moved from unit 1 to another unit, to prevent further contact between Plaintiff and unit 1 staff. In other words, prison officials were not indifferent to Plaintiff's complaints after his return from DWH; they responded to his complaints by separating him from unit 1 staff. Seven months later, Plaintiff allegedly suffered additional mistreatment by prison officials from unit 1, including verbal harassment, theft of property, and accusations of misconduct; however, Plaintiff does not allege that he ever faced a risk of serious physical harm, much less that Gawne was aware of such a risk and deliberately ignored it. The latter conduct is not sufficiently serious to give rise to an Eighth Amendment claim. Consequently, Defendant Gawne will be dismissed for failure to state a claim.

### 9. Psychologist Apol

Plaintiff allegedly complained about "custody issues" to Defendant Apol on various occasions, including the alleged assault by Teft and unspecified "threats" and "name calling" by other prison officials. (Compl., docket #1, Page ID#5.) Apol initially told Plaintiff that there was nothing he could do. Later, however, after Plaintiff told Apol that his life was in danger, Apol

-22-

placed him on observation. To the extent Plaintiff asserts that Apol failed to protect him in violation of the Eighth Amendment, he does not state a claim because he has not alleged that Apol was deliberately indifferent to an objectively serious risk of harm. *See Farmer*, 511 U.S. at 828. Instead, Plaintiff alleges that Apol was aware of incidents involving verbal harassment, vague threats, and a minor physical altercation (none of which posed a risk of serious physical harm), but when Plaintiff told Apol that his life was in danger, Apol took steps to protect Plaintiff by placing him on observation. The foregoing allegations do not state a claim against Apol.

### 10. Psychologist Dozeman

Plaintiff contends that he informed Dozeman on many occasions of "staff brutality" and "repeated threats against [Plaintiff's] person," but Dozeman refused to protect Plaintiff. (Compl., docket #1, Page ID#12.) Plaintiff's allegations are too vague to state a plausible claim. To the extent that Plaintiff asserts a failure-to-protect claim under the Eighth Amendment, he has not alleged facts indicating deliberate indifference to a risk of serious physical harm. He does describe the nature of the threats against him or the "brutality" that he complained about to Dozeman, and given that the many of Plaintiff's allegations concern incidents that did not present a substantial risk of serious physical harm (e.g., verbal harassment, false misconduct charges, theft of property, temporary deprivations of food, a minor physical injury, and the overnight use of shower restraints in response to Plaintiff's assaultive behavior), his allegation that he informed Dozeman of general "brutality" by prison staff is far from sufficient to state a claim that Dozeman was aware of and disregarded a substantial risk of serious physical harm. *See Iqbal*, 556 U.S. at 679 ( "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief.").  Consequently, Dozeman will be dismissed for failure to state a claim.

### 11.  Lieutenant Edwards

Similarly, Plaintiff does not state a claim against Defendant Edwards, who allegedly failed to assist Plaintiff in obtaining medical treatment for the lump on Plaintiff's head, and did not prevent further abuse by prison staff after learning about the alleged assault by Defendant Teft.  As with Defendant Dozeman, Plaintiff has not alleged facts from which to infer that Edwards was deliberately indifferent to an objectively serious risk of harm to Plaintiff.

### 12.  RUO Richardson

Defendant Richardson allegedly escorted Plaintiff to the showers on October 26, 2012, when Rutgers approached them and hurled an insult at Plaintiff.  The foregoing conduct does not state a constitutional claim.  Plaintiff does not allege that Richardson failed to protect Plaintiff from a substantial risk of serious physical harm, as would be necessary to state an Eighth Amendment claim.  *See Farmer*, 511 U.S. at 828.

Plaintiff also alleges that Richardson took Plaintiff's property from his cell, implicating Plaintiff's due process rights.  Under the doctrine in *Parratt v. Taylor*, 451 U.S. 527 (1981), a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy.  *Id.* at 541-44.  If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law."  *Id.* at 537.  This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure.  *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984).  Because Plaintiff's claim is

premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case. Plaintiff has not alleged that state post-deprivation remedies are inadequate. Moreover, numerous state post-deprivation remedies are available to him. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MICH. DEP'T OF CORR., Policy Directive 04.07.112, ¶ B (effective July 9, 2012). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. MICH. COMP. LAWS § 600.6419; Policy Directive, 04.07.112, ¶ B. Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a). The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Thus, he does not state a due process claim against Richardson with respect to the loss of his property.

Plaintiff also asserts that Richardson retaliated against him, but his allegations in that regard are merely conclusory. They do not offer any basis for concluding that Richardson's actions were motivated by Plaintiff's protected conduct. Consequently, Richardson will be dismissed.

### C. Remaining Defendants

At this stage of the case, the Court concludes that Plaintiff states a possible claim against Defendants Corbit, Delano, Gleason, Goodstrey, Jameson, Kemp, Martin, Novak, Payne, Rutgers, Teft, and Unknown Part(y)(ies) ##1-3, and the Court will allow service of the complaint on them.

III.    Motions

### A. Plaintiff's motion for appointment of counsel

Plaintiff requests appointment of counsel because he cannot afford counsel, he is confined in segregation, he has limited access to the law library, and he has a learning disability. Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604-05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604-05; *see Mallard v. U.S. Dist. Court*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these factors and determines that, at this stage of the case, the assistance of counsel does not appear necessary to the proper presentation of Plaintiff's position. Consequently, Plaintiff's motion will be denied.

### B. Plaintiff's motion for a restraining order

Plaintiff contends that he was transferred from ICF to MBP in retaliation for filing the instant action. He asserts that the prison officials responsible for his transfer,

including Defendants Heyns, Prelesnik, Stoddard, Norwood, Huss, and Barber, knew that sending him to MBP would subject him to "immediate" harassment and retaliation, including reduced access to adequate legal writing assistance and unspecified physical and emotional harm, because he assaulted staff at MBP in November, 2011. (Mot., docket #8, Page ID#49.) Plaintiff contends that he was transferred to ICF on an "emergency ride-out" after the assault occurred. (*Id*.) He also contends that it is more difficult for his mother to visit him at MBP. He requests a "restraining order against (MBP) and (ICF)" and an order requiring that he be transferred "back down state." (*Id.*, Page ID#50.)

Absent unusual circumstances, this Court has no authority to order the transfer or non-transfer of inmates to other institutions, as prison officials have considerable discretion in the placement of inmates within the prison system. Plaintiff's motion is arguably a motion for preliminary injunctive relief, though the relief sought is largely unrelated to the claims at issue in the complaint. Plaintiff is not suing Defendants because he was transferred to MBP, and the harm he seeks to avoid at MBP does not involve any of the Defendants named herein. So construed, however, Plaintiff has not shown that preliminary relief in the form of a transfer to another prison is warranted.

The issuance of preliminary injunctive relief is committed to the discretion of the district court. *See Ne. Ohio Coal. v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Nader v. Blackwell*, 230 F.3d 833, 834 (6th Cir. 2000). In exercising that discretion, a court must consider whether plaintiff has established the following elements: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *Id.* These factors are not prerequisites to the grant or denial of injunctive

relief, but factors that must be "carefully balanced" by the district court in exercising its equitable powers. *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985); *see also Ne. Ohio Coal.*, 467 F.3d at 1009. Moreover, where a prison inmate seeks an order enjoining state prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting. *See Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988); *Kendrick v. Bland*, 740 F.2d 432 at 438 n.3 (6th Cir. 1984). The party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1986).

First, though the Court finds that a portion of Plaintiff's complaint is adequate to state a claim, it is not convinced that Plaintiff has a strong likelihood of success on those claims. Second, the presence of irreparable harm is not evident. Since filing his motion, the case has proceeded without incident. Despite his assertion that he would be subject to immediate harassment at MBP, Plaintiff does not contend that he has been threatened or harassed in any manner, or that his access to the courts has been impeded. In other words, Plaintiff has not set forth specific facts showing an immediate, concrete and irreparable harm in the absence of an injunction. Moreover, the interests of identifiable third parties and the public at large weigh against an injunction. Decisions concerning the placement of prisoners are vested in prison officials, in the absence of a constitutional violation. Any interference by the federal courts in the administration of state prisons is necessarily disruptive. The public welfare therefore militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights. *See*

*Glover*, 855 F.2d at 286-87. That showing has not been made here. Accordingly, Plaintiff's motion for a transfer will be denied.

## C. Motions by Inmate Gresham

Mr. Gresham is a state prisoner incarcerated at MBP. He is not a party to this action, but he has filed a motion to intervene, a motion to appoint counsel, and a motion to certify a class.[6] Mr. Gresham asserts that he assisted Defendant Tillman in filing the instant action. As a result, Defendants Huss, Rutgers, and Fair retaliated against him by confiscating his property, issuing him false misconduct tickets, placing him on razor restriction, and denying him meaningful access to the courts. He seeks to join as a plaintiff in this action.

Mr. Gresham's ability to enter this case is governed by Rule 24 of the Federal Rules of Civil Procedure. Rule 24 regulates intervention—a procedure by which an outsider with an interest in a lawsuit may come in as a party, even though the outsider has not been named as a party by the existing litigants. *See* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1901 at 257 (3d ed. 2007). Rule 24 recognizes two types of intervention. The first is intervention of right, which applies when a party is given an unconditional right to intervene by federal statute or claims an interest relating to the property or transaction that is the subject of the pending action and "is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect [his] interest." Fed. R. Civ. P. 24(a). Intervention

---

[6] Mr. Gresham is an active litigant in this Court, having filed over thirty civil actions. More than three of those actions were dismissed for failure to state a claim. *See Gresham v. Caruso*, No. 2:10–cv–195 (W.D. Mich. Apr. 11, 2011); *Gresham v. Paine*, No. 1:10–cv–1146 (W.D. Mich. Mar. 8, 2011); *Gresham v. Caruso*, No. 1:10–cv–1038 (W.D. Mich. Jan. 26, 2011); *Gresham v. Verville*, No. 2:10–cv–198 (W.D. Mich. Jan. 19, 2011); *Gresham v. Mich. Dep't of Corr.*, No. 2:07–cv–241 (W.D. Mich. June 9, 2008). This is not the first case in which Mr. Gresham has attempted to intervene to assert claims that are unrelated to the subject matter of the action. *See Jones v. Corr. Med. Servs.*, No. 1:09-cv-392 (W.D. Mich. Aug. 2, 2010) (denying Gresham's motion to intervene).

of right obviously has no application to the present case. Mr. Gresham has not identified any federal statute giving him an unconditional right to intervene, nor does he allege any interest in the subject-matter of Plaintiff's claims that would be impaired or impeded unless he was allowed to enter this case.

The other kind of intervention allowed by Rule 24 is permissive intervention. The Court may permit a person to intervene if that person is given a conditional right to intervene by federal statute or "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Permissive intervention under Rule 24(b) is entrusted to the sound discretion of the district court. *See Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1248 (6th Cir. 1997). In the present case, it is clear that neither ground for permissive intervention is available. Mr. Gresham does not cite any federal statute that grants him a conditional right to intervene into this case, nor is the Court aware of one.

Furthermore, Mr. Gresham's claims do not share common questions of law or fact with Plaintiff's action. Plaintiff's claims arise from conduct by prison officials specifically directed at Plaintiff, ostensibly in retaliation for Plaintiff's conduct. Mr. Gresham, by contrast, seeks leave to inject into this case unrelated claims that Defendants Huss, Rutgers, and Fair confiscated his property, issued him false misconduct tickets, and placed him on razor restrictions. Mr. Gresham's claims have nothing to do with the events alleged in the complaint and do not present any common question of law or fact with the present case. If Mr. Gresham wishes to litigate his claims, he may do so in a separate lawsuit after complying with all of the prerequisites of the Prison Litigation Reform Act, including exhaustion of administrative remedies and payment of the filing fee. Mr. Gresham's attempts to inject his claims into the present case are not supported by the provisions of

Rule 24 and would be prejudicial to the orderly progress of Plaintiff's action.  Thus, Mr. Gresham's

motion to intervene will be denied.  Finally, because Mr. Gresham is not a party to this action, his

other pending motions for appointment of counsel and for class certification will be denied.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court

determines that Defendants Apol, Barber, Dozeman, Edwards, Fair, Gawne, Gehoski, Gilkey,

Hengesbach, Heyns, Huss, King, Norwood, Prelesnik, Richardson, Smith, Stoddard, Todd, and

Unknown Part(y)(ies) ##4-9 will be dismissed for failure to state a claim pursuant to 28 U.S.C.

§§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).   At this stage of the case, the Court finds

that Plaintiff states a possible claim against Defendants Corbit, Delano, Gleason, Goodstrey,

Jameson, Kemp, Martin, Novak, Payne, Rutgers, Teft, and Unknown Part(y)(ies) ##1-3.  The Court

will order service of the complaint against Defendants Corbit, Delano, Gleason, Goodstrey,

Jameson, Kemp, Martin, Novak, Payne, Rutgers, Teft.[7]  Plaintiff's motions for appointment of

counsel and for a restraining order, as well as the motion filed by Mr. Gresham, will be denied.

An Order consistent with this Opinion will be entered.


Dated: August 19, 2013                                    /s/ Janet T. Neff
                                                       Janet T. Neff
                                                       United States District Judge


_____

[7]The Court does not have sufficient information at this time to order service on Defendants Unknown
Part(y)(ies) ##1-3.