UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TRAVIS TILLMAN #324495,

          Plaintiff,                      Hon. Janet T. Neff

v.                                     Case No. 1:13 CV 297

JOSEPH NOVAK, et al.,

          Defendants.

_____/

## REPORT AND RECOMMENDATION

      This matter is before the Court on Defendants' Motion for Summary Judgment. (Dkt. #32). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motion be **granted in part and denied in part** as detailed herein.


## BACKGROUND

      Plaintiff Travis Tillman[1] is a state prisoner incarcerated by the Michigan Department of Corrections (MDOC) at the Baraga Maximum Facility (AMF), though the events giving rise to this action occurred while he was housed at the Ionia Correctional Facility (ICF). Plaintiff initiated this action against MDOC Director Daniel Heyns and the following ICF employees: Warden John Prelesnik; Acting Warden Cathy Stoddard; Deputy Wardens Erica Huss and Nanette Norwood; Librarian Joseph Novak; Sergeants Christopher King and "Unknown" Goostrey; Lieutenant "Unknown" Edwards;

_____

[1] In his complaint and other pleadings, Plaintiff refers to himself as "Travis Tillman-Bey." This does not, however, appear to be Plaintiff's legal name. *See* http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=324495 (last visited April 21, 2014). Accordingly, the Court will refer to Plaintiff by his given name.

Resident Unit Officers (RUO) J. Fair, "Unknown" Jameson, "Unknown" Rutgers, and "Unknown" Richardson; Corrections Officers "Unknown" Corbit, "Unknown" Martin, "Unknown" Tefft, and "Unknown" Hengesbach; MSW "Unknown" Apol; Registered Nurses (RN) Betty Kemp, Rebecca Delano, and Angela Todd; Unit Chief Charles Gawne; Resident Unit Managers (RUM) Bo Gilkey and "Unknown" Payne; Assistant Resident Unit Supervisors (ARUS) V. Gehoski and Mellisa Barber; Psychologist Kirt Dozeman; Hearing Investigator P. Smith; Acting Lieutenant/Hearing Officer "Unknown" Gleason; "Unknown Shift Commanders from (2/8/12 until 2/10/12)," whom the Court will refer to as Unknown Part(y)(ies) #1; two parties identified as "Unknown ERTs" (hereinafter, Unknown Party #2 and Unknown Party #3, respectively); and "Unknown Internal Affairs Person[nel] (ICF)" (hereinafter, Unknown Part(y)(ies) #4).  (Dkt.#1 at ID##17-19).  Plaintiff also sues the following individuals at the Duane L. Waters Hospital (DWH):[2] "Unknown Female Psychiatrist" (Unknown Party #5);  "Unknown Female Psychologist" (Unknown Party #6); "Unknown Internal Affairs Person[nel] (DWH)" (Unknown Part(y)(ies) #8).  (Dkt.#1 at ID#18).  Finally, Plaintiff sues an unidentified state police officer in Lansing, Michigan (Unknown Party #7), and "Unknown Person[nel]" at the United States Department of Justice (Unknown Part(y)(ies) #9).

The following allegations are contained in Plaintiff's complaint.  On February 2, 2012, Plaintiff was interviewed by the ICF Security Classification Committee.  During this interview, Plaintiff informed Deputy Warden Huss and ARUS Barber that he had written several grievances against staff, but that such were not being properly processed.  Plaintiff also requested that Defendants King, Fair, Rutgers, Martin, and Tefft stop retaliating against him for filing grievances.  Huss promised to look into

---

[2] DWH is a MDOC healthcare facility.  *See* https://www.michigan.gov/corrections/0,4551,7-119-9741_11776---,00.html (last visited on May 6, 2014).

the matter.  Plaintiff also informed RUM Payne about threats of physical harm made by his staff.
Plaintiff was subsequently assaulted by members of Payne's staff.

Later that same day, Defendants Fair, Martin, and Tefft escorted Plaintiff to the shower
area.  When Plaintiff complained about a lack of hot water, Martin responded that "he was not a
plumber, so deal with it."  When Plaintiff finished showering, Tefft escorted him back to his cell.  When
Plaintiff was approximately two feet away from his cell, Defendant Rutgers began closing the cell door.
Plaintiff stopped walking so as to avoid being "smashed" in the door.  Tefft responded by shoving
Plaintiff from behind, causing Plaintiff to strike his head on the side of the door.  After the door closed,
Tefft told Plaintiff, "you['re] keeping those restraints [b]itch," referring to the shower restraints that
Plaintiff had on his wrists and ankles.  Tefft and Rutgers departed, leaving Plaintiff in restraints until the
following morning when they were removed by Defendant Edwards.  Plaintiff developed a lump on his
head as a result of running into the door.  Plaintiff later submitted a request for medical care, but never
received treatment.

On February 8, 2012, Defendant Rutgers entered the housing unit in which Plaintiff
resided and began telling the other prisoners that Plaintiff was a "rat" and a "snitch," that Plaintiff's
family was "calling up to the prison making complaints," and that Plaintiff was writing "snitch kites
(grievances) about staff."  Rutgers further stated that Plaintiff had "seen nothing yet just wait and see."
In response to Rutgers's comments, Plaintiff filled a bottle with urine and threw it in Rutgers's face.
Shortly thereafter, Defendant Goostrey placed Plaintiff in restraints in a "hogtied" position.  Goostrey
and Tefft then mocked Plaintiff by telling him to come to the door to be released from his restraints, even
though the restraints prevented Plaintiff from doing so.  Goostrey and Tefft later charged Plaintiff with
a misconduct violation for refusing to "come out of restraints."

Defendants Goostrey and Tefft left Plaintiff in restraints until February 10, 2012, during which time Plaintiff was deprived of water, showers, food, and the use of a toilet. Plaintiff pleaded with the various shift commanders, identified in Plaintiff's complaint as Unknown Parties #1, to provide him water and an opportunity to go to the bathroom, but they refused.

At around 9:00 a.m on February 10, 2012, Nurse Kemp approached Plaintiff's cell and called out his name. When Plaintiff did not respond, she summoned RUO Jameson, Officer Corbit, and other officers. Jameson told Kemp that Plaintiff was "breathing," after which they all departed. Later that day, Kemp returned to Plaintiff's cell and attempted to get his attention. Plaintiff did not respond, at which point Kemp departed. Kemp subsequently returned with an "ERT Team" which "rushed" into Plaintiff's cell and "jumped on Plaintiff's back." Kemp checked Plaintiff's temperature and blood pressure after which she and the ERT Team departed, leaving Plaintiff in his restraints.

Later that same day, Goostrey and the ERT Team again entered Plaintiff's cell. Goostrey released the chain which connected Plaintiff's wrist and ankle restraints and instructed Plaintiff to stand up. When Plaintiff failed to respond, he was "snatched" off his bed and dragged across the floor to his cell door. Goostrey and the ERT Team then exited Plaintiff's cell and ordered Plaintiff to stand up so they could remove his restraints. Plaintiff was unable to comply. Goostrey and the ERT Team again entered Plaintiff's cell, this time accompanied by RUO Martin, Officer Tefft, and other officers. The group dragged Plaintiff down the hallway slamming him into the floor and walls along the way.

Plaintiff was taken to a dayroom and placed in a cage. Sgt. Goostrey and Nurse Delano returned and asked Plaintiff if they could take his blood pressure. Plaintiff was unable to respond, but Delano told Goostrey that Plaintiff was "faking." Delano, Goostrey, and the ERT Team exited the dayroom. Goostrey later returned with the ERT Team, carrying a can of gas. Goostrey ordered Plaintiff

to stand up so that his restraints could be removed.  Plaintiff immediately started pushing himself up off the floor, but before he could stand up Goostrey sprayed him in the face with gas.  Goostrey sprayed him in the face with "malicious and sadistic intent to retaliate" against him.  Approximately 5-10 minutes later, Nurse Kemp directed that Plaintiff be taken to the hospital.

On February 11, 2012, Plaintiff spoke with a sergeant (identified in Plaintiff's complaint as Unknown Party #7) concerning the events leading to his hospitalization.  The sergeant took photographs of the lacerations on Plaintiff's wrists and elbows and instructed Plaintiff to submit a complaint to internal affairs.  On February 13, 2012, Plaintiff submitted his complaint to a psychiatrist and psychologist (identified in Plaintiff's complaint as Unknown Party #5 and Unknown Party #6) who assured Plaintiff that they would submit the complaint to internal affairs.  Plaintiff never received a response to his complaint.  Plaintiff was discharged from the hospital on February 16, 2012.

When Plaintiff returned to ICF, RUO Fair informed Plaintiff that his "punishment hadn't even started yet[,] just wait and see."  That night, Plaintiff began a hunger strike to protest the actions of prison staff.  The next day, February 17, 2012, Plaintiff told Defendant Apol that his life was in danger because of threats he had received.  Apol placed Plaintiff on observation status and moved him to another cell.  Rutgers later told Plaintiff that he would destroy his property.  Plaintiff was released from observation status on March 5, 2012, but was not given all of his property.  Plaintiff complained to Defendants Huss, Gilkey, Gehoski, Apol, and Corbit, as well as other officers, but was informed that staff could not locate his property.

On March 5, 2012, Officer Hengesbach delivered food to Plaintiff's cell.  Hengesbach attempted to give Plaintiff "food loaf," but Plaintiff refused, stating that he "got off food loaf" the previous day.  Hengesbach departed.  When Hengesbach later returned, Plaintiff asked if he was going

to receive any food.  Hengesbach responded, "Not [t]oday," because Plaintiff "[you] like to throw shit at officers."

On July 2, 2012, Nurse Delano intentionally dropped Plaintiff's medication on the floor, telling him to "write that up bitch."

Plaintiff repeatedly requested legal materials from the ICF law librarian, Defendant Novak.  When his requests where ignored, Plaintiff submitted a grievance about the matter.  On July 7, 2012, Novak issued Plaintiff a misconduct ticket for possession of stolen property/theft of a law book occurring on February 2, 2012.  Plaintiff responded that the book in question disappeared, along with much of his other personal property, during the time that he was on observation status.  Despite being instructed that Plaintiff was not responsible for the loss of the book, Novak issued the misconduct ticket. Plaintiff was found guilty of the charge and punished with 15 days of loss of privileges and a fine of $35.00.  Plaintiff alleges that Novak issued the misconduct ticket in retaliation for Plaintiff's grievance. Plaintiff further alleges that Hearing Investigator Smith was "negligent" in his duties by allowing the misconduct charge to proceed to a hearing and, moreover, that Hearing Officer Gleason acted in an "unprofessional" and "retaliatory" manner by finding Plaintiff guilty of a misconduct for which there was no evidence of guilt.

On the morning of October 26, 2012, Defendants Richardson and Fair escorted Plaintiff to the shower area.  Before they arrived at the showers, however, Rutgers stepped in front of Plaintiff and stated, "[W]hat[']s up my little shit throwing bitch?"  Plaintiff did not respond.  Rutgers then followed Plaintiff into the shower area and told him, "You know you[']re going to die in here?"  While Plaintiff was in the showers, Defendant Fair searched Plaintiff's cell and claimed that he found a knife

in Plaintiff's mattress.  Richardson also entered Plaintiff's cell and confiscated Plaintiff's property. Defendants Fair and Richardson acted out of an intent to retaliate.

Plaintiff's claims against Defendants Apol, Barber, Dozeman, Edwards, Fair, Gawne, Gehoski, Gilkey, Hengesbach, Heyns, Huss, King, Norwood, Prelesnik, Richardson, Smith, Stoddard, Todd, and Unknown Parties #4-#9 have since been dismissed.  (Dkt. #14-15).  Defendants Novak, Goostrey, Rutgers, Martin, Tefft, Wohlfert (f.n.a. Corbett), Jameson, Kemp, Delano, Payne, and Gleason now move for summary judgment on the ground that Plaintiff has failed to properly exhaust his remaining claims.


## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by

admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*,

270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust all available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). Prisoners are no longer required to demonstrate exhaustion in their complaints. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA" which the defendant bears the burden of establishing. *Id.* With respect to what constitutes proper exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion" defined as "compliance with an agency's

deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006).  In *Bock*, the Court reiterated that

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'  The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Bock*, 549 U.S. at 218.

When assessing whether a prisoner has properly exhausted his claims as required by the PLRA, it is appropriate to seek guidance from the substantively similar exhaustion rules applicable to petitions for writ of habeas corpus.  *See Woodford,* 548 U.S. at 88.  In the habeas context, a petitioner is required to properly present his federal claims through one complete round of the State's established appellate review process.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999).  To "'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies."  *Id.* at 848 (citation omitted).  The Supreme Court has stated that in the habeas context, "the sanction for failing to exhaust properly (preclusion of federal review) is called procedural default."  *Woodford,* 548 U.S. at 92.  To determine whether a habeas petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir.2004), *cert. denied,* 544 U.S. 928 (2005); *accord Lancaster v. Adams,* 324 F.3d 423, 436-37 (6th Cir.2003).

Under the procedural default component of § 1997e(a), a prisoner's claims are procedurally defaulted if he fails to complete the administrative review process in accordance with the deadlines and other applicable procedural rules and prison officials actually relied upon the procedural rule to bar review of the grievance. *See Johnson v. Meadows,* 418 F.3d 1152, 1159 (11th Cir.2005), *cert. denied,* 126 S.Ct. 2978 (2006); *Spruill v. Gillis,* 372 F.3d 218, 222 (3rd Cir.2004) (holding that "the determination whether a prisoner has 'properly' exhausted a claim (for procedural default purposes) is made by evaluating the prisoner's compliance with the prison's administrative regulations"). Moreover, just as procedural default in the federal habeas corpus context must be predicated on an adequate and independent state ground, the procedural requirements of a prison grievance system may not be imposed in a way that offends the United States Constitution or the intended purposes of § 1997e(a). *See Spruill,* 372 F.3d at 232.

In support of their respective positions, the parties have submitted copies of various grievances that Plaintiff has filed during the relevant time period, as well as additional relevant evidence. An examination of this evidence reveals that, with one exception, Plaintiff's remaining claims must be dismissed for failure to properly exhaust administrative remedies.

I.        ICF-13-03-0469-22a

Plaintiff initiated this grievance on March 5, 2013. (Dkt. #33, Exhibit B). Defendants concede that Plaintiff pursued this grievance through all three steps of the grievance process, but argue that because Plaintiff initiated the present action before properly completing the prison grievance process, this grievance cannot serve to exhaust any of the claims asserted in Plaintiff's complaint.

Where an inmate files a civil action in federal court before completing the available administrative processes, his complaint (or certain claims therein) must be dismissed for failure to properly exhaust administrative remedies. *See, e.g., Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) ("we must dismiss plaintiff's complaint because he filed his federal complaint before allowing the administrative process to be completed"); *Larkins v. Wilkinson*, 1998 WL 898870 at *2 (6th Cir., Dec. 17, 1998) (inmate's "attempt to exhaust his available administrative remedies only after filing suit in federal court ignores the clear mandate of § 1997e(a)"); *McKaye v. Burnett*, 104 Fed. Appx. 515, 516 (6th Cir., July 13, 2004) (same). As discussed below, because Plaintiff initiated the present action before allowing the prison grievance process to be completed, this particular grievance cannot serve to exhaust any of Plaintiff's remaining claims.

According to MDOC policy, "[t]he total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing by the Grievance Coordinator at Step I and/or Step II." Mich. Dep't. of Corr., Policy Directive 03.02.130 ¶ S (effective July 9, 2007). MDOC policy further provides that if prison officials fail to timely respond to a grievance, the inmate may proceed to the next step in the grievance process. *See* Mich. Dep't. of Corr., Policy Directive 03.02.130 ¶ T.

In circumstances in which a prisoner initiates legal action prior to receiving a response to his Step III grievance, but after the expiration of the aforementioned 120 day period, the Court has determined that such constitutes proper exhaustion of available administrative remedies. As the Court has observed, to conclude otherwise would permit MDOC officials to easily obtain the dismissal of *every* lawsuit filed by a prisoner who properly complies with the MDOC's grievance policies. MDOC officials would need only ignore every Step III grievance until after the expiration of the 120 day period and

simply wait until the prisoner files a lawsuit.  Once the prisoner files a lawsuit, MDOC officials could then issue a response to the Step III grievance and claim that the lawsuit must be dismissed because it was filed before the inmate completed the administrative process.  The present circumstance, however, is distinguishable.

Plaintiff initiated this grievance on March 5, 2013.  Thus, the administrative grievance process was not properly completed until the sooner of the following: (1) Plaintiff receiving a response to his Step III grievance, or (2) the expiration, on July 3, 2013, of the 120-day grievance response period. When Plaintiff initiated the present lawsuit on March 20, 2013, however, he had neither received a response to his Step III grievance nor had the 120-day period expired.  Simply stated, when Plaintiff initiated the present action, the MDOC grievance process had not been completed.

Moreover, the fact that prison officials did not provide a response to Plaintiff's Step III grievance until after the expiration of the 120-day period is irrelevant.  As the Sixth Circuit has made clear, whether the grievance process is properly completed after the initiation of legal action is irrelevant. Instead, the relevant question is whether the grievance process has been properly completed at the moment legal action is initiated.  Accordingly, this particular grievance cannot serve to exhaust any of Plaintiff's remaining claims.

II.         ICF-13-02-389-12b4 and ICF-13-02-0395-27z

Plaintiff initiated these two grievances on February 19, 2013.  (Dkt. #33, Exhibit B). Defendants concede that Plaintiff pursued both grievances through all three steps of the grievance process, but argue that because Plaintiff initiated the present action before properly completing the prison

grievance process, these grievances cannot serve to exhaust any of the claims asserted in Plaintiff's complaint.

Plaintiff initiated these grievances on February 19, 2013.  Thus, the administrative grievance process was not properly completed until the sooner of the following: (1) Plaintiff receiving a response to his Step III grievance, or (2) the expiration, on June 19, 2013, of the 120-day grievance response period.  When Plaintiff initiated the present lawsuit on March 20, 2013, however, he had neither received a response to his Step III grievance nor had the 120-day period expired.  Simply stated, when Plaintiff initiated the present action, the MDOC grievance process had not been completed.  Accordingly, these particular grievance cannot serve to exhaust any of Plaintiff's remaining claims.

III.        ICF-12-10-3625-17f and ICF-12-11-3682-07d

Plaintiff initiated both of these grievances on October 29, 2012, alleging that on October 26, 2012, he was verbally harassed by Defendant Rutgers.  (Dkt. #48 at ID#498 and ID#504).  Plaintiff also alleged that Defendant Fair fabricated a charge that Plaintiff was in possession of a weapon.  (Dkt. #48 at ID#498 and ID#504).  Both of these grievances were rejected because each was allegedly duplicative of the other.  (Dkt. #48 at ID#499 and ID#505).  Defendants assert that these grievances cannot serve to exhaust any of Plaintiff's remaining claims because (1) both grievances were rejected as duplicative and (2) Plaintiff initiated the present action before properly completing the prison grievance process.

Plaintiff submitted these grievances on October 29, 2012. As discussed above, therefore, the administrative grievance process was not properly completed until the sooner of the following: (1) Plaintiff receiving a response to his Step III grievance, or (2) the expiration, on February 26, 2013, of

the 120-day period[3] within which these grievances were to be resolved.  When Plaintiff initiated the present lawsuit on March 20, 2013, he had complied with the relevant grievance policy and, therefore, cannot be found to have failed to properly exhaust these claims on the ground that he initiated the present action prior to receiving a response to his Step III grievance.

As the Court has previously observed, to conclude otherwise would permit MDOC officials to easily obtain the dismissal of *every* lawsuit filed by a prisoner who properly complies with the MDOC's grievance policies.  MDOC officials would need only ignore every Step III grievance until after the expiration of the 120 day period and simply wait until the prisoner files a lawsuit.  Once the prisoner files a lawsuit, MDOC officials could then issue a response to the Step III grievance and claim that the lawsuit must be dismissed because it was filed before the inmate completed the administrative process.  Accordingly, the Court finds that the initiation of the present action was not premature relative to these two grievances.

The Court must also, however, address the fact that both of these grievances were rejected on the ground that each was duplicative of the other.  MDOC Policy clearly provides that a grievance may be rejected if "raises issues that are duplicative of those raised in another grievance filed by the grievant."  Mich. Dep't. of Corr., Policy Directive 03.02.130 ¶ G.  It is certainly reasonable for prison officials to reject a grievance which is duplicative of a previously submitted grievance.  However, the Court does not read the policy in question as authorizing, in a circumstance where a prisoner files a duplicative grievance, the rejection of *both* the original grievance *and* the subsequent duplicative grievance as was done in this instance.  In the Court's estimation such an interpretation would be fundamentally unfair.  Defendant has identified no authority permitting such or interpreting the Policy

---

[3]  There is no indication in the record that the response time concerning these grievances was extended beyond 120 days.

Directive in such a manner. In the absence of any authority supporting such an interpretation, the Court declines to interpret the relevant Policy Directive as permitting the rejection of *both* grievances in this circumstance as duplicative *of each other*.[4]

The Court cannot discern which of the two grievances was filed first because, as previously noted, both grievances were submitted by Plaintiff on the same day. The grievances were not processed by prison officials on the same day, however. Grievance ICF-12-10-3625-17f was received by prison officials on October 31, 2012. (Dkt. #48 at ID#498). Grievance ICF-12-11-3682-07d was received by prison officials on November 8, 2012. (Dkt. #48 at ID#504). Because Grievance ICF-12-11-3682-07d was the latter of these two grievances to be processed, its rejection as duplicative of Grievance ICF-12-10-3625-17f was appropriate. Thus, Grievance ICF-12-11-3682-07d cannot serve to exhaust any of Plaintiff's remaining claims. The Court reaches a different result, however, as to Grievance ICF-12-10-3625-17f. Evidence submitted by Defendants indicates that this grievance was pursued through all three steps of the grievance process. (Dkt. #33, Exhibit B). Accordingly, the Court finds that the claims asserted in Grievance ICF-12-10-3625-17f against Defendant Rutgers[5] have been properly exhausted and must go forward.

IV.         ICF-12-01-0144-17b

Plaintiff initiated this grievance on January 25, 2012. (Dkt. #33, Exhibit B). The allegations in Plaintiff's complaint, however, concern events which transpired between February 2, 2012,

---

[4] This is not to suggest that prison officials are without recourse in such circumstances. In fact, the relevant Policy Directive provides that a prisoner who "files an excessive number of grievances which are. . .duplicative. . .may have access to the grievance process limited. . ." Mich. Dep't of Corr., Policy Directive 03.02.130 ¶ HH.

[5] The other Defendants identified in this particular grievance, Huss, Richardson, and Fair, have already been dismissed from this action.

and October 26, 2012. Because this grievance concerns events which occurred prior to the events giving rise to the present action, this grievance cannot serve to exhaust any of Plaintiff's remaining claims.


V.        ICF-11-12-2397-12b4

Plaintiff initiated this grievance on December 6, 2011. (Dkt. #33, Exhibit B). The allegations in Plaintiff's complaint, however, concern events which transpired between February 2, 2012, and October 26, 2012. Because this grievance concerns events which occurred prior to the events giving rise to the present action, this grievance cannot serve to exhaust any of Plaintiff's remaining claims.


VI.       ICF-12-05-0777-19z

Plaintiff filed this grievance on April 30, 2012, alleging that on April 23, 2012, an unidentified prison official refused his request to receive certain law books. (Dkt. #48 at ID#521). This grievance fails to exhaust any of Plaintiff's remaining claims for several reasons. First, the grievance is not asserted against any specific individual. Second, Plaintiff's complaint contains no allegations consistent with the facts alleged in this grievance. The most significant deficiency with this grievance, however, is that Plaintiff has not properly pursued such through all three steps of the grievance process.

Evidence submitted by Plaintiff and Defendants indicates that Plaintiff's Step III grievance was returned to Plaintiff with instructions to resubmit such along with the documents regarding his Step I and Step II grievances. (Dkt. #33, Exhibit B; Dkt. #48 at ID#528). Plaintiff was informed that submission of the requested documents was a prerequisite to submitting a Step III grievance. Plaintiff concedes that he did not comply with these instructions. Thus, Defendants have

established that Plaintiff failed to properly pursue this grievance through all three steps of the grievance process. Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.

VI.        ICF-12-07-1141-28e

        Plaintiff filed this grievance on July 3, 2012. (Dkt. #33, Exhibit C). Plaintiff alleged that Defendant Delano, while making "medication rounds" the previous day, deliberately threw his medication on the floor of his cell. Plaintiff alleged that Delano did this in retaliation for a grievance he filed more than four months previous. Plaintiff's Step I grievance was rejected as untimely in violation of MDOC policy. *See* Mich. Dep't. of Corr., Policy Directive 03.02.130 ¶ P.

        This particular determination was clearly erroneous, however. The Step I grievance respondent clearly misinterpreted Plaintiff's grievance, finding that Plaintiff's grievance concerned events occurring on February 10, 2012, several months prior to the filing of the grievance. If such were the case, Plaintiff's grievance *would* have been untimely. As Plaintiff clearly explained in his grievance, however, his grievance concerned events which occurred the previous day which would render his grievance timely. Denying a grievance on procedural grounds, based on such a clear factual error, calls into doubt Defendants' assertion that Plaintiff has failed to properly exhaust the claims alleged in this grievance. *See Bock*, 549 U.S. at 218 ("[c]ompliance with prison grievance procedures. . .is all that is required by the PLRA to 'properly exhaust'"); *Spruill,* 372 F.3d at 232 (the procedural requirements of a prison grievance system may not be imposed in a way that offends the United States Constitution or the intended purposes of § 1997e(a)).[6]

_____

        [6] The Court is not suggesting that it possesses the authority (or desire) to undertake general review of the MDOC's grievance process. Nevertheless, the Court does not read the relevant exhaustion authority as precluding a prisoner from pursuing legal relief based on a clearly erroneous determination that the prisoner failed to comply with the prison's administrative grievance process. Such a result is untenable as it would give to prison officials the ability to immunize themselves from any and all prisoner

Plaintiff's Step II grievance was likewise denied as untimely.  Specifically, the response indicates that Plaintiff failed to timely submit his Step II grievance.  This determination, supported by the record, was upheld at Step III.  Accordingly, this grievance cannot serve to exhaust any of Plaintiff's remaining claims.

VII.        ICF-12-07-1228-27z

Plaintiff filed this grievance on July 16, 2012, alleging that Sergeant Lewis fabricated a response to a grievance he had filed.  (Dkt. #33, Exhibit E).  Plaintiff has not asserted in his complaint any claims against Sergeant Lewis.  Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.

VIII.       ICF-12-06-1032-17b

Plaintiff filed this grievance on June 18, 2012, alleging that on June 14, 2012, Defendant Rutgers subjected him to verbal harassment.  (Dkt. #33, Exhibit F).  Plaintiff has not asserted in his complaint any allegations concerning events which allegedly occurred on June 14, 2012.  Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.

IX.         ICF-12-07-1115-28e

Plaintiff filed this grievance on February 16, 2012, alleging that on February 10, 2012, Defendant Goostrey fabricated a reason to place Plaintiff in hard restraints.  (Dkt. #33, Exhibit G).

---

lawsuits simply by improperly concluding that a prisoner failed to comply with a particular procedural requirement.  The Court need not, in this instance, address this particular issue, however, because as discussed below, Plaintiff's Step II and Step III grievances were denied for a separate procedural shortcoming which is supported by the record.

Plaintiff's grievance was rejected as untimely because it was not filed within the time limit prescribed by MDOC policy. *See* Mich. Dep't. of Corr., Policy Directive 03.02.130 ¶ P. Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.

X.          ICF-12-04-0652-12f3

Plaintiff filed this grievance on April 5, 2012, alleging that on February 17, 2012, Defendants Kemp and Delano "crushed up" his medications. (Dkt. #33, Exhibit H). Plaintiff's complaint contains no such allegations. Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.

XI.          ICF-12-03-0406-17i

Plaintiff filed this grievance on March 5, 2012, alleging that earlier that day, Defendant Hengesbach and Corrections Officer Sisson conspired to deny him food. (Dkt. #33, Exhibit I). Corrections Officer Sisson is not a party to this matter and Plaintiff's claims against Defendant Hengesbach have already been dismissed. (Dkt. #14). Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.

XII.          ICF-12-03-0487-15b

Plaintiff filed this grievance on March 18, 2012, alleging that on March 15, 2012, an unknown prison official refused to properly process his outgoing legal mail. (Dkt. #33, Exhibit J). Plaintiff's complaint contains no such allegations. Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.

XIII.          ICF-12-03-0470-07f

Plaintiff filed this grievance on March 10, 2012, alleging that on March 5, 2012, Defendant Rutgers improperly disposed of his personal property.  (Dkt. #33, Exhibit K).  While Plaintiff makes reference in his complaint to the alleged loss of his personal property, (Dkt. #1 at ¶ 30), Plaintiff makes no allegations in his complaint that Defendant Rutgers was responsible for such.  Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.


XIV.          ICF-11-12-2455-17i

Plaintiff filed this grievance on or about December 11, 2011, alleging that Defendant Martin denied him an opportunity to shower.  (Dkt. #33, Exhibit L).  Plaintiff's complaint contains no such allegations.  Accordingly, this grievance fails to exhaust any of Plaintiff's remaining claims.


XV.           Exhaustion Summary

In conclusion, for the reasons articulated herein, the undersigned recommends that Plaintiff's remaining claims against Defendants Novak, Goostrey, Martin, Tefft, Wohlfert (f.n.a. Corbett), Jameson, Kemp, Delano, Payne, and Gleason be dismissed for failure to exhaust administrative remedies.  The undersigned further recommends that Plaintiff's claims against Defendant Rutgers be dismissed for failure to exhaust administrative remedies except as to the allegations advanced in Grievance ICF-12-10-3625-17f.

II.          **Unserved Defendants**

Federal Rule of Civil Procedure 4(c) indicates that "[a] summons must be served together with a copy of the complaint."  The time frame within which service must be effected is articulated in Rule 4(m), which provides that if service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, "the court - on motion or on its own after notice to the plaintiff - must dismiss the action without prejudice against that defendant or order that service be made within a specified time."  If the plaintiff demonstrates good cause for such failure, however, the court "must extend the time for service for an appropriate period."  Fed. R. Civ. P. 4(m).  The Court is raising this issue sua sponte and this Report and Recommendation serves as notice to Plaintiff.

Plaintiff initiated this action on March 20, 2013.  On August 19, 2013, the Court dismissed many of Plaintiff's claims, but concluded that Plaintiff's complaint be served on numerous Defendants, including several Unknown Parties some of whom have already been dismissed.  Since that time, Plaintiff has failed to identify the remaining Unknown Parties and, moreover, has failed to request assistance in identifying such.  Considering Plaintiff's lack of diligence, the Court recommends that Plaintiff's claims against Defendants Unknown Party #1, Unknown Party #2, and Unknown Party #3 be dismissed without prejudice for failure to timely effect service.

**CONCLUSION**

For the reasons articulated herein, the undersigned recommends that <u>Defendants' Motion for Summary Judgment</u>, (Dkt. #32), be **granted in part and denied in part**.

Specifically, for the reasons articulated herein, the undersigned recommends that Plaintiff's remaining claims against Defendants Novak, Goostrey, Martin, Tefft, Wohlfert (f.n.a.

Corbett), Jameson, Kemp, Delano, Payne, and Gleason be dismissed for failure to exhaust administrative remedies. The undersigned further recommends that Plaintiff's claims against Defendant Rutgers be dismissed for failure to exhaust administrative remedies except as to the allegations advanced in Grievance ICF-12-10-3625-17f.

The undersigned further recommends that Plaintiff's claims against Defendants Unknown Party #1, Unknown Party #2, and Unknown Party #3 be dismissed without prejudice for failure to timely effect service. Finally, the undersigned recommends that appeal of this matter would not be taken in good faith. *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997); 28 U.S.C. § 1915(a)(3).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,


Date: June 17, 2014                          /s/ Ellen S. Carmody
                                             ELLEN S. CARMODY
                                             United States Magistrate Judge